1 | **SHEPHERD, FINKELMAN,**
2 | **MILLER & SHAH, LLP**
Kolin Tang (SBN 279834)
3 | Email: ktang@sfmslaw.com
4 | 1401 Dove Street, Suite 510
Newport Beach, CA 92660
5 | Telephone: (323) 510-4060
6 | Facsimile: (866) 300-7367

7 | [Additional Counsel Listed
8 | on Signature Page]

9 | *Attorneys for Plaintiff*
10 | *and the Proposed Classes*

11 | **IN THE UNITED STATES DISTRICT COURT**
12 | **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

<table>
<tr><td>13</td><td>ENTEWAN FARAGALLA,</td><td>)</td><td>CIVIL ACTION NO. 5:20-CV-1025</td></tr>
<tr><td>14</td><td>JOHN L. URBAN, RITESH</td><td>)</td><td></td></tr>
<tr><td></td><td>PATEL, and WILLIAM</td><td>)</td><td></td></tr>
<tr><td>15</td><td>CRAVENS On Behalf of</td><td>)</td><td>**FIRST AMENDED CLASS**</td></tr>
<tr><td>16</td><td>Themselves and All Others</td><td>)</td><td>**ACTION COMPLAINT**</td></tr>
<tr><td></td><td>Similarly Situated,</td><td>)</td><td></td></tr>
<tr><td>17</td><td></td><td>)</td><td></td></tr>
<tr><td>18</td><td>Plaintiff,</td><td>)</td><td>JURY TRIAL DEMANDED</td></tr>
<tr><td>19</td><td>vs.</td><td>)</td><td></td></tr>
<tr><td>20</td><td>TESLA INC., d/b/a TESLA</td><td>)</td><td></td></tr>
<tr><td></td><td>MOTORS, INC.,</td><td>)</td><td></td></tr>
<tr><td>21</td><td>Defendant.</td><td>)</td><td></td></tr>
</table>

22

23 |     Plaintiffs, Entewan Faragalla ("Faragalla"), John L. Urban ("Urban"), Ritesh

24 | Patel ("Patel"), and Williams Cravens ("Cravens") (collectively, "Plaintiffs"), by

25 | and through their attorneys, file this First Amended Class Action Complaint on

26 | behalf of themselves and all others similarly situated against Defendant, Tesla Inc.

27 | d/b/a Tesla Motors, Inc. ("Defendant" or "Tesla"), and allege as follows:

28

## NATURE OF THE ACTION

1. Plaintiffs bring this action individually and on behalf of a nationwide class and, in the alternative, on behalf of state-wide subclasses for the states of California, Florida, Pennsylvania, and Texas (more fully defined below) for the benefit and protection of purchasers and lessees of Defendant's model years 2014-2016 Model S and 2015-2016 Model X vehicles ("Vehicle(s)").  As alleged herein, Defendant's Vehicles are defective insofar as they are equipped with defective touchscreen media control units ("MCU(s)") which routinely fail after only a few years of normal use, which impacts many of the Vehicles' intended, essential functions, including safety features, and, as a result, places drivers of the Vehicles, including Plaintiffs, in unsafe positions.

2. In manufacturing, marketing, and selling and/or leasing these unsafe Vehicles, Defendant has engaged in unfair, deceptive, and misleading consumer practices with respect to the marketing and sale and/or lease of the Vehicles, and has breached its contract and warranty with the Vehicles' purchasers and lessees, including Plaintiffs.

3. As a result of the Defect (more fully defined below), Plaintiffs and class members are unable to utilize their Vehicles as marketed and have incurred damages as a result.  In addition, the Defect poses a significant safety concern, and, though numerous consumers have specifically complained about it, Tesla has failed to adequately address the Defect.

4. Plaintiffs bring this action on behalf of themselves and all other similarly-situated consumers to obtain redress for those who have purchased or leased the Vehicles across the United States, and to stop Defendant's false and misleading marketing relating to the sale and lease of the Vehicles.  Plaintiffs allege violations of the California Consumers Legal Remedies Act, Civil Code §§ 1750, *et seq*. ("CLRA"); the Unfair Competition Law, California Business and

Professions Code §§ 17200, *et seq*. ("UCL"); breach of express warranty under California law; and breach of the implied warranty of merchantability under California law on behalf of the proposed Nationwide Class and, in the alternative, the proposed California Sub-Class.  Urban also alleges violations of the Florida Deceptive Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq.*; breach of express warranty; and breach of the implied warranty of merchantability under Florida law, in the alternative, on behalf of the proposed Florida Sub-Class.  Patel also alleges violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1 to 201-9.2; breach of express warranty; and breach of the implied warranty of merchantability under Pennsylvania law, in the alternative, on behalf of the proposed Pennsylvania Sub-Class.  Cravens also alleged breach of express contract under Texas law; and breach of the implied warranty of merchantability under Texas law, in the alternative, on behalf of the proposed Texas Sub-Class.

## **JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2)(A) because the claims relating to the matter in controversy exceed $5 million, exclusive of interest and costs, the proposed Classes have at least 100 members, and this is a class action in which certain of the class members (including Plaintiff) and Defendant are citizens of different states.

6.      Venue is proper in this judicial District under 28 U.S.C. § 1391 because Defendant does business throughout this District, and a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

7.      At all pertinent times, Defendant was engaged in the marketing, sale and lease of the Vehicles, which are the subject of this lawsuit, in this District and throughout the United States.

**PARTIES**

8.     Plaintiff Faragalla is, and at all times relevant to this action has been, a resident of Menifee, California, and, thus, is a citizen of California.

9.     Plaintiff Urban is, and at all times relevant to this action has been, a resident of Maitland, Florida, and, thus, is a citizen of Florida.

10.     Plaintiff Patel is, and at all times relevant to this action has been, a resident of Blue Bell, Pennsylvania, and, thus, is a citizen of Pennsylvania.

11.     Plaintiff Cravens is, and at all times relevant to this action has been, a resident of Dallas, Texas, and, thus, is a citizen of Texas.

12.     Defendant is a Delaware corporation and is headquartered in Palo Alto, California.  Defendant, thus, is a citizen of Delaware and California.  Defendant markets, sells, and leases the Vehicles throughout the United States, including in this District.

**SUBSTANTIVE ALLEGATIONS**

13.     This is an action brought against Defendant on behalf of Plaintiffs and all persons who purchased or leased a model year 2014-2016 Model S or 2015-2016 Model X Vehicle.

14.     Tesla was founded in 2003, and launched its first vehicle, the Roadster, in 2008.  Thereafter, Tesla designed an all-electric sedan, called the Model S.  In 2015, Tesla expanded its product line with the Model X, a sport utility vehicle.[1]

15.     Tesla's sales model is unlike that of traditional car manufacturers, in that it does not sell its vehicles through authorized dealerships.  All Tesla sales and leases are conducted online, either by a consumer independently, or at one of Tesla's in-person stores or showrooms.[2]  Every sale or lease of a Tesla vehicle,

---

[1] *About Tesla*, Tesla, accessible at https://www.tesla.com/about (last visited Apr. 22, 2020).

[2] Peter Aitken, *The 6 Main Differences Between Buying a Tesla and Buying a Car*

including the Vehicles, is a direct transaction between the consumer and Tesla, unless purchased used from a third party.

16.     Defendant describes the Model S as "the best car in its class in every category."  Further, "[c]ombining safety, performance, and efficiency, Model S has reset the world's expectations for the car of the 21st century with the longest range of any electric vehicle, over-the-air software updates that make it better over time, and a record 0-60 mph acceleration time of 2.28 seconds as measured by Motor Trend."[3]

17.     Additionally, Defendant describes its Model X as "the safest, quickest and most capable sport utility vehicle in history."[4]

18.     However, the Vehicles do not, in fact, "become better over time," and are neither safe nor capable in the long-term, as the MCU, which controls all essential functions of the Vehicles, including several safety features, inexplicably fails after only a few years of normal use.  Defendant has failed to ensure the safety of Vehicle purchasers and lessees and has, in fact, greatly jeopardized their safety by selling and leasing Vehicles that pose a severe danger.

19.     The Defect at issue in this case relates to the Vehicles' touchscreen MCU, a system designed to attract buyers who want to manage available technology while on the road, while minimizing distractions and maximizing safety.  Tesla allows purchasers and lessees to customize the features controlled by their Vehicles' MCUs, several of which are add-on items that customers pay extra for when purchasing a Vehicle.

---

*from Other Brands*, Business Insider (Jul. 18, 2019), accessible at https://www.businessinsider.com/tesla-vs-other-car-difference-electric-charger-2019-7 (last visited Apr. 22, 2020).
[3] *About Tesla*, Tesla, accessible at https://www.tesla.com/about (last visited Apr. 22, 2020).
[4] *Id.*

20.     The MCU is the gateway between the user and the Vehicles' safety, navigation, communications, and entertainment features.  However, the Vehicles are defective insofar as, after a few years of normal, day-to-day usage, the MCU in the center console routinely goes blank, disabling several essential functions of the Vehicle, including safety features, such as: exterior lights; acceleration settings; steering modes; regenerative braking; stopping mode; the entire sound system, including the turn-signal tones; displaying warning notifications; critical gauges; GPS navigation; self-driving mode; rear view camera; ability to charge; suspension; heating and air conditioning; the sunroof; and the "PIN to Drive" function, among others (the "Defect").

21.     As a result of the Defect, the Vehicles' MCUs frequently go blank, freezing and/or crashing and rendering many of the Vehicles' features inoperable. This poses a safety risk because when the system goes blank and malfunctions, it causes drivers to become distracted and it causes safety-related systems (including, for example, critical gauges and warning notifications) to fail.

22.     Defendant has long known or should have known of the Vehicles' MCU problems from multiple sources.  These sources include warranty claims data; consumer complaints made directly to Defendant, collected by the National Highway Transportation Safety Administration ("NHTSA"); and consumer complaints posted on public online forums.  By its own admission, Tesla has stated that "[s]ince we own all of our service centers, we are aware of every incident that happens with our customer cars and we are aware of every part that gets replaced. Whenever there is even a potential issue with one of those parts, we investigate fully."[5]  Yet, Defendant has failed to warn purchasers and lessees about the possibility of the Vehicles' MCUs malfunctioning and disabling the Vehicles'

---

[5] The Tesla Team, *A Grain of Salt*, Tesla (June 9, 2016), accessible at https://www.tesla.com/blog/grain-of-salt (last visited Apr. 28, 2020).

essential features, including numerous safety features.  Defendant did not include any such warnings or instructions in its Owner's Manuals,[6] or in any of its other representations about the Vehicles.  In fact, Defendant has made no efforts to make purchasers and lessees aware of any MCU malfunction issues.

23.     Tesla dedicates over forty pages of its Model S and Model X Owner's Manuals to describing the various features of the MCU, including the system's controls (including exterior lights, acceleration settings, steering modes, regenerative braking, stopping mode, and autopilot); climate controls; maps and navigation; media and audio; phone; air suspension; calendar; safety and security settings; HomeLink Universal Transceiver; connecting to WiFi; software updates; and the Vehicles' mobile app.[7]  Nowhere in these sections, or anywhere in the Owner's Manuals, does Tesla address the possibility that the MCU screen might go blank and malfunction, disabling all of these features, including safety features.  At most, in its Owner's Manuals, Tesla explains: "If your touchscreen is unresponsive or demonstrates unusual behavior, you can restart it to potentially resolve the issue" or "power cycle" the Vehicle, emphasizing that "restarting the touchscreen should be done only when the vehicle is in Park."[8]  However, oftentimes, drivers are not in a position to shift their Vehicles into "Park" when the MCU malfunctions (for example, if they are driving on a highway), and even when drivers do attempt to restart their touchscreens or power cycle their Vehicles after

---

[6] *See* Tesla Model S Owner's Manual, accessible at https://www.tesla.com/sites/default/files/model_s_owners_manual_north_america_en_us.pdf (last visited Apr. 28, 2020) ("Model S Manual"); Tesla Model X Owner's Manual, accessible at https://www.tesla.com/sites/default/files/model_x_owners_manual_north_america_en.pdf (last visited Apr. 28, 2020) ("Model X Manual") (collectively "Owner's Manuals").

[7] *See* Model S Manual at 118-159; Model X Manual at 139-181.

[8] Model S Manual at 50-51; Model X Manual at 61-62.

the Defect manifests, restarting does not resolve the issue.  Tesla offers no other instruction on how a user might attempt to troubleshoot or correct the issue.  Tesla offers no guidance and no solution to this problem, which shuts down numerous essential functions of the Vehicle, including numerous safety features.

24.     The Vehicles are covered by a New Vehicle Limited Warranty, which includes a Basic Vehicle Limited Warranty[9] and a Parts, Body & Paint Repair Limited Warranty,[10] which specifically covers the touchscreen and microcontroller (collectively, "Warranty").  Under the Warranty, Tesla warrants that it will cover the repair or replacement necessary to correct defects in the materials or workmanship of any parts manufactured or supplied by Tesla that occur under normal use for a period of 4 years or 50,000 miles, whichever comes first.

25.     Tesla has represented that safety is a paramount concern, that "improving safety is our primary goal, even after a customer purchases their car," and has explained that the "massive amount of real-world data gathered from our cars' eight cameras, 12 ultrasonic sensors, and forward-facing radar" helps Tesla ensure that accidents are less likely to occur.[11]  Tesla further explains that its new safety features are implemented in older model year Vehicles through software updates, which is "just another way that we are helping to protect Tesla drivers and passengers, and others on the road, every day."[12]  However, none of these safety features are operable or controllable when the MCU malfunctions.

---

[9] New Vehicle Limited Warranty, Model S, Model X, Model 3, Model Y, accessible at https://www.tesla.com/sites/default/files/downloads/tesla-new-vehicle-limited-warranty-en-us.pdf (last visited Apr. 28, 2020).
[10] Tesla Parts, Body, and Paint Repair Limited Warranty, accessible at https://www.tesla.com/sites/default/files/downloads/tesla-parts-accessories-body-repair-limited-warranty-en-us.pdf (last visited Apr. 28 2020).
[11] The Tesla Team, *More Advanced Safety for Tesla Owners*, Tesla (May 2, 2019), accessible at https://www.tesla.com/blog/more-advanced-safety-tesla-owners (last visited Apr. 28, 2020).
[12] *Id.*

26.     Specifically, Tesla has stated that the "Model S gets faster, smarter, and better as time passes," with updates ensuring "added functionality, enhanced performance, and improved user experience" including "important active safety features."[13]  Further, Tesla has stated that it "engineered Model X to be the safest SUV ever."[14]

27.     However, despite Defendant's representations that driver safety is a paramount concern, that the Vehicles are high-performance, and warranting that it will "repair or replace" the touchscreen and microcontroller, among other parts, defective in material or workmanship, Defendant sells its Vehicles knowing that the MCUs malfunction.  Specifically, Defendant omits that the MCUs may go blank, disabling various essential features, including safety features, and omits a solution for how a user can effectively solve this problem.  Despite requests by Plaintiff and members of the proposed Classes, Defendant has refused to properly and sufficiently repair and/or replace this known Defect, which is a serious safety hazard.  Defendant's actions and omissions constitutes a breach of the Warranty.

28.     Tesla has not found a solution to the MCU Defect.  Instead, Tesla tells Vehicle owners and lessees to wait for forthcoming software updates that should supposedly fix the MCU problems (which ultimately fail to actually fix the problems), or, alternatively, simply replaces the defective parts with equally defective parts, leaving consumers caught in a cycle of use, malfunction, and replacement.

29.     As a result of the Defect, Plaintiff and members of the proposed Classes cannot rely upon their Vehicles to safely transport them from place to place

---

[13] The Tesla Team, *Model S Has You Covered*, Tesla (Mar. 19, 2015), accessible at https://www.tesla.com/blog/model-s-has-you-covered (last visited Apr. 28, 2020).

[14] The Tesla Team, *Tesla Model X the First SUV Ever to Achieve 5-Star Crash Rating in Every Category*, Tesla (June 13, 2017), accessible at https://www.tesla.com/blog/tesla-model-x-5-star-safety-rating (last visited Apr. 28, 2020).

because, at any time, the MCUs may malfunction, disabling various essential features of the Vehicles, including safety features.

30.     Accordingly, Defendant's marketing statements that the Vehicles improve over time, are engineered to include premier safety features, and deliver superior performance are false and deceptive, and Defendant's omissions regarding the Defect constitute breach of express and implied warranties.

31.     The safety issues caused by the failure of the MCU has been recognized by NHTSA's Office of Defects Investigation ("ODI").  On June 22, 2020, after Faragalla filed this action, ODI opened an investigation regarding the 2012-2015 Tesla Model S regarding the failure of the MCU touchscreen which, *inter alia*, results in the loss of the rear camera image display when reverse gear is selected, resulting in reduced rear visibility.[15]  This investigation alone covers approximately 63,000 Vehicles.[16]

32.     In its summary description of the investigation, ODI explains that "MCU failures resulting from eMMC memory wear-out are likely to occur after periods of progressively degraded performance" and that "[f]inal MCU failure results in loss of audible and visual features provided by the touchscreen."  The summary includes failure of such features as infotainment, navigation, web browsing, rear camera image display when reverse gear is selected, climate control, and battery charging.

33.     Though the ODI investigation is limited to the 2012-2015 Model S, as detailed *infra*, the same MCU failure is present in at least the 2016 Model S and 2015-2016 Model X vehicles.

34.     Despite Tesla's knowledge of the Defect, Tesla has yet to offer a solution for the Defect to consumers.

---

[15]  *See* ODI Resume, Investigation PE 20-010, accessible at https://static.nhtsa.gov/odi/inv/2020/INOA-PE20010-4553.PDF (last visited Sept. 1, 2020).
[16]  *Id.*

**Plaintiffs' Experiences With Their Vehicles**

**Plaintiff Faragalla**

35.     On or about April 8, 2015, Faragalla purchased a model year 2015 Tesla Model S directly from Tesla's headquarters in Palo Alto, California via Tesla's website, with delivery to take place on or about May 11, 2015.  Faragalla paid an additional $4,250 for the tech package with autopilot.  One of the reasons Faragalla purchased the Vehicle was because of its high-tech features, including several of the features accessible solely through the MCU.

36.     Prior to purchase, Faragalla recalls extensively researching the features of the Vehicle.  The primary reasons for purchasing the Vehicle were the safety and technology features available through and controlled by the MCU.

37.     Faragalla has followed Tesla's instructions in its Model S Manual to install software updates immediately when they become available.

38.     On countless occasions after purchasing the Vehicle, and on some occasions while driving, the MCU in Faragalla's Vehicle spontaneously went blank, disabling various features, including the safety features, accessible solely through the MCU.  On each such occasion, Tesla personnel instructed Faragalla to conduct a soft and hard reset, which worked to restart the MCU, except for the last time, requiring a replacement of the MCU.

39.     Concerned for his safety, the safety of others in his Vehicle, and others on the road, Faragalla took his Vehicle to a Tesla service center in Rancho Cucamonga, California on March 9, 2020 for Tesla's recommendation on how to address or repair the issue.  Tesla performed a general diagnosis on the Vehicle, and removed and replaced the MCU.

40.     Faragalla paid out of pocket ($2,290.50) for the diagnosis, repair, and replacement, as Tesla claimed they were not covered by Tesla's Warranty.

41.     However, Tesla's solution was no solution at all, as Tesla simply

replaced a defective MCU with an equally defective MCU.

42.     Faragalla contested the charge of $2,290.50 for the replacement of the MCU claiming that his experiences demonstrated that there was a Defect associated with the MCU.  The Tesla service manager disagreed and asserted it was not a Defect and required Faragalla to pay out of pocket for the MCU replacement. During his time in the Tesla service center, several Tesla employees came forward to Faragalla and stated that the MCU indeed suffered from a Defect, and they have seen the MCU failures occur on a recurring basis.  The Tesla employees added that the Vehicles should have been recalled due to the Defect.

43.     Tesla's purported repair did not correct the Defect in the Vehicle in order to permit Faragalla to safely and properly continue driving his Vehicle without the risk of the MCU spontaneously going blank and malfunctioning, disabling various features of the Vehicle.

44.     Faragalla would not have purchased the Vehicle, or would not have paid the purchase price that he did, had he known that he would not be able to safely drive the Vehicle without risk of the MCU going blank, malfunctioning, and disabling numerous features of the Vehicle, including safety features.

**Plaintiff Urban**

45.     On or about April 5, 2015, Urban ordered a model year 2015 Tesla Model S P85D Ludicrous directly from Tesla's headquarters in Palo Alto, California via Tesla's website, with delivery to take place on or about June 4, 2015. Urban paid an additional $5,000 for the Vehicle to be upgraded to "Ludicrous" mode.  One of the reasons Urban purchased the Vehicle was because of its high-tech features, including several of the features accessible solely through the MCU.

46.     Urban has followed Tesla's instructions in its Model S Manual to install software updates immediately when they become available.

47.     On several occasions after purchasing the Vehicle, and on some

occasions while driving, the MCU in Urban's Vehicle spontaneously went blank, disabling various features, including the safety features, accessible solely through the MCU.

48.    Urban began experiencing the MCU failure in 2019.  On several occasions when Urban experienced the MCU failure, Tesla repeatedly instructed him to reboot the system.  On at least one occasion, a Tesla technician remotely accessible the Vehicle to reset it. Ultimately, however, this temporary fix of rebooting and resetting the MCU stopped working, and he had no ability to fix his MCU.

49.    Urban has corresponded extensively with Tesla about the issue.  At some point, Tesla apparently had two versions of the MCU with which Tesla could replace Urban's defective MCU.  Tesla told Urban that replacing his defective MCU with the older version would cost him about $1,200.   while replacing his defective MCU with the newer version would cost him approximately $2,500. Urban opted for the newer version of the MCU, which Tesla explained would be a permanent fix, as opposed to the older version of the MCU which would be just as defective as his current MCU.

50.    In order to have the newer version of the MCU installed in his Vehicle, Tesla needed to make several updates and changes to his Vehicle first. This process took several weeks.

51.    Concerned for his safety, the safety of others in his Vehicle, and others on the road, Urban took his Vehicle to a Tesla service center in Orlando, Florida on August 21, 2020 for Tesla's recommendation on how to address or repair the issue.  Tesla performed a general diagnosis on the Vehicle, and removed and replaced the MCU.

52.    Urban told Tesla that he believed the repair and replacement of his defective MCU should be covered by Tesla, especially in light of the known MCU

issues and ongoing ODI investigation.  Tesla, however, refused to cover the repairs and replacement, and required Urban to pay out of pocket ($2,750.00) for the diagnosis, repair, and replacement, as Tesla claimed they were not covered by Tesla's Warranty.

53.   Urban would not have purchased the Vehicle, or would not have paid the purchase price that he did, had he known that he would not be able to safely drive the Vehicle without risk of the MCU going blank, malfunctioning, and disabling numerous features of the Vehicle, including safety features.

**Plaintiff Patel**

54.   On or about April 15, 2016, Patel configured a model year 2016 Tesla Model S, making a deposit of $2500. He then purchased the car on or about April 25, 2016 in an agreement directly with Tesla's headquarters in Palo Alto, California, with delivery to take place on or about April 26, 2016.  One of the reasons Patel purchased the Vehicle was because of its high-tech features, including several of the features accessible solely through the MCU. Patel also paid an additional $2500 for the Auto-Pilot feature.

55.   Patel has followed Tesla's instructions in its Model S Manual to install software updates immediately when they become available.

56.   On several occasions after purchasing the Vehicle, and on some occasions while driving, the MCU in Patel's Vehicle spontaneously went blank, disabling various features, including the safety features, accessible solely through the MCU.

57.   On August 5, the MCU again went blank. Because of the "PIN to Drive" feature, Patel was unable to activate the vehicle. Concerned for his safety, the safety of others in his Vehicle, and others on the road, Patel had his Vehicle dragged and towed out of his garage and dropped off at the Tesla service center in Devon, Pennsylvania. On August 6, 2020, Tesla performed a general diagnosis on

the Vehicle, and removed and parts of the MCU, initially stating to Patel that the entire MCU panel would need to be replaced and that it would take time to order and receive the replacement. Later, Tesla said only a component of the MCU would be needed, which component replacement was ordered.

58.     On August 24, 2020, Patel paid out of pocket ($519.77) for the diagnosis, repair, and replacement, as Tesla claimed they were not covered by Tesla's Warranty.

59.     However, Tesla's solution was no solution at all, as Tesla simply replaced defective MCU parts with equally defective MCU parts.

60.     Tesla's purported repair did not correct the Defect in the Vehicle in order to permit Patel to safely and properly continue driving his Vehicle without the risk of the MCU spontaneously going blank and malfunctioning, disabling various features of the Vehicle.

61.     Patel would not have purchased the Vehicle, or would not have paid the purchase price that he did, had he known that he would not be able to safely drive the Vehicle without risk of the MCU going blank, malfunctioning, and disabling numerous features of the Vehicle, including safety features.

**Plaintiff Cravens**

62.     On or about February 10, 2015, Cravens purchased a model year 2015 Tesla Model S directly from Tesla's headquarters in Palo Alto, California via Tesla's website, with delivery to take place on or about February 13, 2015.  One of the reasons Cravens purchased the Vehicle was because of its high-tech features, including several of the features accessible solely through the MCU.

63.     Cravens has followed Tesla's instructions in its Model S Manual to install software updates immediately when they become available.

64.     On several occasions after purchasing the Vehicle, and on some occasions while driving, the MCU in Cravens' Vehicle spontaneously went blank,

disabling various features, including the safety features, accessible solely through the MCU.

65.     Concerned for his safety, the safety of others in his Vehicle, and others on the road, Cravens took his Vehicle to a Tesla service center in Dallas, Texas on October 24, 2018 for Tesla's recommendation on how to address or repair the issue.  Tesla performed a "courtesy inspection" and updated the firmware of the Vehicle, but otherwise did not address the MCU issue.

66.     Cravens took his Vehicle into the same Tesla service center in Dallas just over a month later, on November 20, 2018, for persistent MCU failures.  Tesla noted in the invoice that it the technicians were able to "duplicat[e] customer's concern and determin[e] that issue is being caused by a known firmware bug and will be resolved with a future firmware update," and that Tesla purported to repair the issue by "[p]erform[ing] factor reset and firmware update."  However, this firmware update did not fix the MCU failure issue, and Cravens continued to experience his MCU going blank.

67.     On May 15, 2020, Cravens once again took his Vehicle into the Tesla service center in Dallas, Texas because of the continued and persistent MCU failures.  This time, the technicians removed and replace the MCU with a re-manufactured MCU, allegedly "restor[ing]" the touchscreen operation.  However, unlike the diagnoses in October and November 2018, when Tesla merely reset and/or updated Cravens' Vehicle, Tesla did not cover the repair and replacement of Cravens' MCU under its Warranty.

68.     On May 19, 2020, Cravens paid out of pocket ($1,561.62) for the diagnosis, repair, and replacement of his MCU, as Tesla claimed they were not covered by Tesla's Warranty.

69.     However, Tesla's solution was no solution at all, as Tesla simply replaced defective MCU with a re-manufactured, equally defective MCU.

70.     Tesla's purported repair did not correct the Defect in the Vehicle in order to permit Cravens to safely and properly continue driving his Vehicle without the risk of the MCU spontaneously going blank and malfunctioning, disabling various features of the Vehicle.

71.     Cravens would not have purchased the Vehicle, or would not have paid the purchase price that he did, had he known that he would not be able to safely drive the Vehicle without risk of the MCU going blank, malfunctioning, and disabling numerous features of the Vehicle, including safety features.

**All Plaintiffs**

72.     All of the Plaintiffs purchased/leased their Vehicles primarily for personal, family, or household use.

73.     At all times, Plaintiffs have attempted to drive their Vehicles in a manner that was both foreseeable, and in which they were intended to be used.

74.     Plaintiffs continue to be presented with Tesla's misrepresentations about its Vehicles.  Plaintiffs desire to purchase and use Vehicles that are safe, with MCUs that do not spontaneously and frequently go blank, freeze and/or crash, rendering many of the Vehicles' features inoperable.  Plaintiffs would purchase vehicles from Defendants that provided safety and prevented against such malfunction.

75.      Given Defendant's misrepresentations and omissions, however, Plaintiffs have no way to determine whether any of Defendants' representations about the performance and safety of the Vehicles, or any of their other vehicles, are, in fact, true

**Class Members' Experiences With the Vehicles**

76.     Plaintiffs' experiences mirror those of numerous other Tesla Vehicle purchasers and lessees.  The internet contains numerous complaints from owners and lessees who, like Plaintiffs, have experienced the MCUs in their Vehicles

malfunction, disabling numerous features of the Vehicles.  Tesla operates an online discussion forum restricted to verified Tesla owners.  The following is a sample of complaints appearing on Tesla's online forum[17]:

**Submitted by DallasModelS**
**Posted on April 24, 2019**
**Location unknown**

> My MCU was always rebooting and I had always pointed out the service center. The issue started at around 39k. They said it was nothing. Again it had pointed out at 49k (before the warranty expired). Nothing was done. The answer I always got was "it seems to be working fine now, just reset the trips and clear the address history and it will be fine". Never worked since then. Screen would always reboot and locations wouldn't load. For the last 10k miles we had been using google maps. Couple of months ago I took it again and they flashed the CPU and reinstalled the software and I was told that it should be fine now ($175). Last week, I was driving and the screen starting rebooting again and was stuck in a constant loop where the car was functional but nothing else worked. I had to take it in right away considering it was 90 degrees and I had a toddler in the car and the AC wouldn't turn on. Same problem as before but not the MCU unit had to be replaced. Almost 3k with labor (they did pay for half of it because it was a known issue and I did point it out before the warranty expired). Wait what. Why should I even pay for half of it? The service managers are just a human shield for deflection.
> And check this out. I dropped it off with 59 miles because it was an emergency and a week later they did not plug it in and I got three notifications to plug in the car. I called them with no answer. The charge dropped below 10 miles and the 12V battery died while at the service center. And I had to pay for that as well! Nope not their fault.

---

[17] All complaints listed from Tesla's online discussion forum are accessible at the following web addresses: https://forums.tesla.com/forum/forums/mcu-always-had-problems-and-finally-failed-costing-fortune (last visited Apr. 28, 2020); https://forums.tesla.com/forum/forums/screen-shut-completely-while-driving#new (last visited Apr. 30, 2020); https://forums.tesla.com/forum/forums/mcu-failures (last visited Apr. 30, 2020).

The customer service representative did not even know that could happen. It is comical.

Love the car but I'm afraid that service centers have no empathy and are just cold. Just can't make a product, you have to stand behind it. How does a MCU which controls 99% of the function of the car fail in under 3 years?

**Submitted by p.c.mcavoy**
**Posted on April 24, 2019**
**Location unknown**

I know another owner, his is a[n] older MS, but similar story where was having symptoms of issues, yet no hard failure, prior to his MCU being diagnosed as failed about a month or so after his warranty expired. Similar results where local service center failed to cover the replacement of the MCU under warranty and failed to provide him with diagnostic logs which he felt could substantiate the presence of stored errors confirming issue started before the 4 yr/50k mile expired.

I know some of you will find stories like this hard to believe, but this individual was a very ardent supporter of Tesla, was considering a new roadster as his next vehicle, but this soured his willingness to be an advocate for the brand going forward.

Not everyone gets the same level of goodwill which some of you experience.

**Submitted by wayne.xin**
**Posted on April 25, 2016**
**Location unknown**

I had a similar experience. A couple of weeks ago, Tesla mobile service came to my house to do a recall work for passenger side airbag, when the technician finishes his work the central screen stopped working but he left by saying he will ask someone to check the cause of the problem. After that I never head the technician's reply, then I took the car to the service center they want me to pay the full cost to replace the touch screen unit (include MCU) because the vehicle is out of Warranty by one month.

First Amended Class Action Complaint
19

**Submitted by Bighorn**
**Posted on February 1, 2020**
**Location unknown**

Mine failed at 283k miles with lots of temperature extreme exposure ranging from 26 below to 116F. The MCU failure is well known and related to eMMC longevity. It has a known lifetime of P/E cycles and it's been programmed to write a tremendous amount of data. There is debate as to whether all data recording is necessary, but the failures have nothing to do with exposure to the weather. Some DIYers have been switching in higher capacity eMMCs, but it is not an easy task for physical desoldering and reprogramming reasons.

**Submitted by Aneurysm**
**Posted on April 24, 2019**
**Location unknown**

This past weekend while I was driving, my screen shut off completely. I was still able to control the acceleration and steering and so I made my way across a lane to the shoulder (I put my turn signal on but since screen was shut off, I am not sure if it was working). Once on shoulder, It rebooted or I forced the reboot (cant remember exactly) and then it was fine afterward.

**Submitted by jonabramson**
**Posted on April 24, 2019**
**Location unknown**

I had this happen on the highway on a long trip. Was listening to SiriusXM through my phone and black screen. Seems a bit freaky when it happened but I've done a few manual reboots so I know what it looks like. My wife says I'm just driving around my computer. Didn't know it would be like my Windows PC. Hopefully, the need to reboot resolves soon with an update.

**Submitted by Hwhsu**
**Posted on April 24, 2019**
**Location unknown**

Happened to me twice in last 30 days, while driving. Scared the heck out of me

**Submitted by jer1776**
**Posted on April 26, 2019**
**Location unknown**

Happened to me yesterday. Screen did not turn on when I entered the car and then waited about a minute and then it booted up. I did notice that the AC was not going, but the fan was. The screen went blank about a minute or two after this and this time I was driving, but luckily it was in my neighborhood, but scared the crap out of me. The car was still drivable, but again noticed that the fan was on, but it did not seem to be blowing AC. Stopped the car and did a reboot. On 2019.8.5. I also notice I get a lot of brake checking while on Autopilot with this update. Hopefully that will be fixed in 12.1.

**Submitted by marcelletaglecornell**
**Posted on May 11, 2019**
**Location unknown**

It happened to me twice a couple of days after software update. Both times I was driving on the freeway. The first time, screen shut off for a few seconds then rebooted. The second time around, I was driving with family on the freeway on the way from Tucson to Phoenix. It started with flickering screen then it shut off. It was kinda [sic] scary as I didn't know whether my car would stall in the middle of the freeway. I exited on the first exit I saw, did not know how to reboot the car. When we finally figured how to reboot the car, it did not take long. No further issues since then.

**Submitted by dborn@nsw.au**
**Posted on December 12, 2017**
**Location unknown**

My guess? You need a new center console. I had a similar problem earlier this year. Part of the attempted resuscitation (which failed, by the way), was a deep reboot. The instructions were to hold down the brake for the duration, press and hold both scroll wheels until the T logo appeared on the screen. About 45 secs!! The replacement should be around 2 hours labor. Mine had to be completely reprogrammed as if a new car. Very annoying. I lost EVERY setting /pairing I had in there. Oh, you need to remove any USB sticks before trying the maneuver.

**Submitted by tozz**
**Posted on January 30, 2018**
**Location unknown**

This sounds like your eMMC has failed. The eMMC is a soldered flash drive (like a SD card) that is used to store data from your car (like logs).

These SD cards have a limited lifespan and a limited write cycle (like SSDs).

So all these eMMC chips will fail sooner or later (depending on temperature, number of blocks written to the chip, etc). It's a shame Tesla didn't make these replaceable. Then you would be fine with a $10 flashdrive instead of a $4000 new MCU.

**Submitted by bill**
**Posted on February 5, 2020**
**Location unknown**

Is anyone tracking MCU failures like they are tracking Updates? It would be really interesting to know how many MCUs have failed. What age they failed at, years and miles? What was the cause of the failure, i.e. was it the logging memory chip?

I suspect Tesla knows but probably would not tell us.

**Submitted by brdinjd**
**Posted on February 6, 2020**
**Location unknown**

Just paid $2933 for my obligatory MCU replacement today. 2015 85D. Just out of warranty (of course). I suspect my story is (or will be) as common as it is frustrating. I do feel this issue should be on the level of recall since it is actually caused by overactive use by Tesla (e.g. logging) for their own purposes.

77.    Similarly, there are also numerous complaints about this issue on the NHTSA website[18]:

---

[18] The NHTSA complaints listed herein are a sample of complaints filed concerning the Defect.  All complaints listed can be accessed at the following web addresses:
https://www.nhtsa.gov/vehicle/2013/TESLA/MODEL%252520S/5%252520HB/RWD (last visited Apr. 28, 2020);
https://www.nhtsa.gov/vehicle/2014/TESLA/MODEL%252520S/5%252520HB/RWD (last visited Apr. 28, 2020);
https://www.nhtsa.gov/vehicle/2015/TESLA/MODEL%252520S%25252060KWH/5%252520HB/RWD (last visited Apr. 28, 2020);
https://www.nhtsa.gov/vehicle/2016/TESLA/MODEL%252520X%25252060D/SU

**NHTSA ID Number: 11256588**
**Incident Date January 12, 2019**
**Consumer Location SARASOTA, FL**
**Vehicle Identification Number 5YJSA1H15EF\*\*\*\***
**2014 Tesla Model S**

Touch screen control panel has been deteriorating over the past 2 years. Since the screen is an integral part of the vehicle control system functionality of the vehicle control is beginning to be impacted. Tesla has had a known problem, but has not been willing to repair or replace. I believe this is a safety concern that NHTSA should investigate and that tesla should be held accountable.

**NHTSA ID Number: 11279959**
**Incident Date November 6, 2019**
**Consumer Location PORTER RANCH, CA**
**Vehicle Identification Number 5YJSA1H18EF\*\*\*\***
**2014 Tesla Model S**

Vehicles media control unit (MCU) has a known and well-publicized defect caused by over-logging on the emmc chip. This defect causes the MCU to glitch, reboot and fail eliminating the ability to control both safety and convenience features including climate control, defroster, GPS, audible safety warnings and other systems. Vehicle can also stop charging. . . . The most recent "fix" via an over the air update simply delays the issue until vehicle is out of warranty but based on current evidence this defect will effect [sic] 100% of cars, both model s and x, made between 2012 and early 2018.

**NHTSA ID Number: 11312177**
**Incident Date February 13, 2020**
**Consumer Location SPRING HILL, TN**
**Vehicle Identification Number 5YJSA1H1XEF\*\*\*\***
**2014 Tesla Model S**

The Tesla Model S has a bad MCU unit (media control unit) every car made suffers from a programming overload that ruins the tegra 3 emmc flash memory. Once the memory corrupts, the media control

---

V/AWD%252520Later%252520Release (last visited Apr. 28, 2020).

unit shuts off permanently. A driver can end up stranded because the car will also stop charging or limit the charge to 21%. The safety systems attached to the media control unit are all off and no longer function. Safety backup cameras, audible alerts and perimeter alarms that would tell you if a person/object is in proximity to the car, all no longer function. The inability to know and react to these safety systems presents a life/safety issue. A child could be behind the car and the car will not alert the driver and the driver cannot see because the camera is also off. The cars media control unit also shuts off mid-drive. The unit turning off without warning, presents a life safety issue.

**NHTSA ID Number: 10927077**
**Incident Date October 19, 2016**
**Consumer Location LOS GATOS, CA**
**Vehicle Identification Number 5YJSA1E21FF******
**2015 Tesla Model S**

[A] couple of weeks ago the computer system of the car experienced a software crash. As a result the side mirrors did not open and the rear view camera did not work. The car was still drive-able I needed to take my son to school so didn't have time to troubleshoot this. This was very unsafe to drive, particularly on the freeway, and I believe it is illegal in California to drive without working mirrors. I contacted tesla about this and they did not offer any specifics. I believe this is a major issue. Operational mirrors are essential equipment . . . . Tesla's plan to replace side mirrors with video cameras is worrisome in this regard.

**NHTSA ID Number: 11207819**
**Incident Date May 10, 2019**
**Consumer Location SEATTLE, WA**
**Vehicle Identification Number 5YJSA1S27FF******
**2015 Tesla Model S**

There is a flaw in the tesla emmc which will inevitably cause a critical portion of the chip to fail prematurely, due to constant excessive logging within the touchscreen system. Ultimately the memory chip fails and the touchscreen goes black, placing the car in limp home mode, the parking sensors and rear view camera no longer work, it will not charge and effectively becomes un-drivable when the battery

runs out. The emmc is a linchpin component for the functionality of the car.

The emmc, though it does not control the car's propulsion, braking or steering, is the heart of the touchscreen which is used to turn on headlights, adjust hvac and all car settings run through the touchscreen. The hvac unit now has a "dog mode" which keeps the cabin cool for dogs or occupants waiting in car. The failure of the touchscreen unit while in dog mode could result in heat-related fatality . . . .

For more information here are some references:

- video showing an engineer who's helped several hundred customers disable logging between minutes 8 through 12:

Https://youtu.be/o-7b1waoj9q?t=499

- a recent article explaining the flaw: https://www.thedrive.com/news/27945/a-single-component-can-brick-older-teslas-and-tesla-wont-fix-it

This has been a known problem by the Tesla owners community for upwards of a year now and requires a simple software update to remedy - disable logging to emmc memory.

According to other owners, this problem exists on all current and past tesla models and it is a matter of "when" not "if" for all chips to fail unless they make a change to their software logging.

**NHTSA ID Number: 11281197**
**Incident Date October 11, 2019**
**Consumer Location NORTHRIDGE, CA**
**Vehicle Identification Number 5YJSA1H23FF\*\*\*\***
**2015 Tesla Model S**

Touchscreen that controls most vehicle functions including hvac became disabled because a chip in the touchscreen went bad.

The car was unable to charge and would take approx 5 mins to start at times.

Unable to clear fogged windows with hvac

**NHTSA ID Number: 11302674**
**Incident Date January 13, 2020**
**Consumer Location GARDNERVILLE, NV**
**Vehicle Identification Number 5YJSA1E24FF\*\*\*\***
**2015 Tesla Model S**

The main instrument panel (call the media control unit or "MCU") eventually fails in all older Teslas (pre 2018) due to a defect in the design of MCU and overuse by excessive writing of data to the memory with firmware updates as well as logging for tesla's own purposes. The consumer has no ability to turn off updates or logging which means that tesla is causing the failures with its own actions. The MCU has been shown to fail within approximately 4-5 years (or right after the warranty expires).

This is a significant safety issue as once the MCU fails, many functions of the car fail. This includes the backup camera, the audio indicators for turn signals and other alerts, climate control, as well as the safety monitors associated with "auto-pilot" (e.g. all restrictions are removed).

Tesla's position is that the consumer must pay to replace the MCU once it fails if the car is out of warranty. They have upgraded the MCU design and logging process for newer Teslas (post 2018) but all cars from 2012 to 2018 are affected by the original defect[] . . . . Hence, this petition is to require tesla to acknowledge the defect in the original MCU and replace via recall, and/or compensate customers who were forced to pay for replacement.

**NHTSA ID Number: 11315374**
**Incident Date February 10, 2020**
**Consumer Location BRYANT, AL**
**Vehicle Identification Number 5YJSA1E29FF\*\*\*\***
**2015 Tesla Model S**

No warning whatsoever, the 17" touchscreen goes black on our Model S. I try the reboot, but nothing happens. It's early February, so here in Alabama, it's cold. We keep the car in the garage. No climate control

is working. We pull out, head to my wife's families house 7-8 miles away, and the windshield has a couple of inch strip at the bottom that visible. So driving between 10-15 mph, we make it to their house. I finally get ahold of tesla a little while later. After about 30 minutes or less on the phone with them, they said they see what the problem is. The lady stated that the tesla engineers know about this problem and have been working to get it fixed. I was originally scheduled for repair on February, 17th. They contacted me two or three days before then and said they were anticipating the part to arrive on February 27th, so they proactively rescheduled my appointment for February 28th. After calling, emailing and then finally chatting tesla on February 27th, they said the part still hadn't arrived. They told me they were going to escalate my case and they also rescheduled my appointment for March 13th with no guarantee that the part would be in by then. A loaner vehicle wasn't offered after asking multiple times. The reason was because my vehicle was out of warranty. We purchased this vehicle used from a third party, not tesla. We had the vehicle almost a year and a half before this happened. The vehicle was stationary. We are on rural to country (not dirt) roads. The HVAC doesn't work at all, nor does the parking sensors. Navigation is out, pretty much all the extra features (mostly) you can forget about using.

**NHTSA ID Number: 11317875**
**Incident Date March 1, 2020**
**Consumer Location PALM BEACH, FL**
**Vehicle Identification Number 5YJSA1H24FF****
**2015 Tesla Model S**

The main computer display and memory card fails - freezing all safety monitoring of the car, lose control of charging (i.e. refueling). Suspension control lost, basically everything frozen without this - it is known common failure emmc chip.

**NHTSA ID Number: 11317499**
**Incident Date March 3, 2020**
**Consumer Location RENO, NV**
**Vehicle Identification Number 5YJSA1H27FF****
**2015 Tesla Model S**

MCU failure due to mmc drive failing. Known issue for months. No parts. Cannot charge and therefore cannot drive. Been a week with no communication. No plan.

**NHTSA ID Number: 11300619**
**Incident Date November 8, 2019**
**Consumer Location ROCKLIN, CA**
**Vehicle Identification Number 5YJXCAE29GF\*\*\*\***
**2016 Tesla Model X**

I have had problems with my Tesla . . .
computer shot down while driving and screen went blank. City streets

Tomorrow again I am taking the car for repair because of doors malfunctioning

I don't find it safe. I left it in the service center. I have only driven it 2000 miles over 13 months.

78.     Defendant had knowledge that its Vehicles contained the Defect, and yet, continued to market its Vehicles without disclosing the existence of the Defect to consumers.  Despite the numerous consumer complaints posted on NHTSA, on Tesla's online forum, communicated to Tesla through consumers seeking service related to the Defect, and disclosed to Tesla through ODI's investigation, Tesla has no solution to this serious problem, and continues to omit the existence of the Defect from its marketing.

79.     Defendant had knowledge that its misrepresentations and omissions regarding the safety and performance of the Vehicles were misleading, yet it continued to make the same misrepresentations and omissions regarding each subsequent model year Vehicle to Plaintiffs and members of the proposed Classes, despite the fact that Defendant knew that the Vehicles were defective.

80.     Defendant's marketing practices are clearly meant to mislead consumers as to the safety and performance of the Vehicles.  As a direct and

proximate result of Defendant's conduct, Plaintiffs and the proposed Classes have suffered, and continue to suffer, injury in fact, ascertainable loss, and lost money. Defendant, despite having knowledge that its representations and omissions are misleading to Plaintiffs and the proposed Classes, continues to market the Vehicles in a deceptive manner.

81.     Plaintiffs and the proposed Classes are at risk of suffering further injury if the relief sought is not granted.

**California Contacts**

82.     Defendant is headquartered in California at 3500 Deer Creek Road, Palo Alto, California.

83.     Defendant does substantial business in California, with a significant portion of its sales and leases made in California.

84.     California hosts a significant portion of Defendant's U.S. operations, including, *inter alia*, its sales and service offices, factory, and financial service offices.

85.     In addition, the conduct that forms the basis for each and every Class member's claims against Defendant emanated from its headquarters in California, and is consistent with directives of its personnel in California.

86.     Defendant's marketing personnel are located at its California headquarters, and the marketing schemes, as well as the Owner's Manuals describing the safety and performance of the Vehicles (which omitted to describe the Defect), and website representations, were made and implemented from Defendant's California headquarters.

87.     Defendant's California personnel implemented its deceptive marketing scheme and other materials and have refused to repair the Defect in Plaintiff's and the proposed Class members' Vehicles.

88.     Defendant has significant contacts with the State of California, and the conduct at issue herein emanated from California.

89.     As a result of Defendant's conduct, Plaintiffs and members of the proposed Classes have suffered injury in fact and have otherwise suffered damages, and have been harmed and will continue to be harmed in the future, unless Defendant is held accountable through this litigation.

90.     Plaintiffs seek injunctive relief, actual damages, disgorgement of profits, statutory damages, attorneys' fees, costs, and all other relief available to the Classes, as defined herein.

## TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

91.     Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Defect and misrepresentations and omissions alleged herein.  Through no fault or lack of diligence, Plaintiffs and members of the Classes were deceived regarding the Vehicles and could not reasonably discover the Defect or Defendant's deception with respect to the Defect. Defendant continues to deny the existence and extent of the Defect, even when questioned by Plaintiffs and members of the Classes.

92.     Plaintiffs and members of the Classes did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was concealing a defect and/or the Vehicles contained the Defect and the corresponding safety risk.  As alleged herein, the existence of the Defect was material to Plaintiffs and members of the Classes at all relevant times.  Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Classes could not have discovered, through the exercise of reasonable diligence, the existence of the Defect or that Defendant was concealing the Defect.

93.     At all times, Defendant was and is under a continuous duty to disclose to Plaintiffs and members of the Classes the true standard, quality and grade of the

Vehicles and to disclose the Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Defect in the Vehicles.

94.     Defendant knowingly, actively and affirmatively concealed the facts alleged herein.  Plaintiffs and members of the Classes reasonably relied on Defendant's knowing, active, and affirmative concealment.

95.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

96.     Plaintiffs brings this lawsuit, both on behalf of themselves and as a class action, on behalf of similarly-situated purchasers and lessees of the Vehicles pursuant to Federal Rule of Civil Procedure 23(b)(2) and (3) and seeks to represent the following Class, defined as:

**Nationwide Class (represented by Plaintiffs)**
All owners and lessees of Defendant's model year 2014-2016 Model S and/or model year 2015-2016 Model X Vehicles purchased or leased in the United States.

97.     In the alternative, Plaintiffs bring this action as a class action on behalf of the following Sub-Classes for the purposes of Plaintiffs' respective state law claims, defined as:

**California Sub-Class (represented by Faragalla)**
All owners and lessees of Defendant's model year 2014-2016 Model S and/or model year 2015-2016 Model X Vehicles purchased or leased in California.

**Florida Sub-Class (represented by Urban)**
All owners and lessees of Defendant's model year 2014-2016 Model S and/or model year 2015-2016 Model X Vehicles purchased or leased in Florida.

**Pennsylvania Sub-Class (represented by Patel)**
All owners and lessees of Defendant's model year 2014-2016 Model S and/or model year 2015-2016 Model X Vehicles purchased or leased in Pennsylvania.

**Texas Sub-Class (represented by Cravens)**
All owners and lessees of Defendant's model year 2014-2016 Model S and/or model year 2015-2016 Model X Vehicles purchased or leased in Texas.

Excluded from the Nationwide Class and the California, Florida, Pennsylvania, and Texas Sub-Classes (collectively and defined herein, the "Class" or "Classes") are Defendant, as well as Defendant's affiliates, employees, officers and directors, and the Judge to whom this case is assigned. Plaintiffs reserve the right to amend the definition of the Classes if discovery and/or further investigation reveal that the Classes should be expanded or otherwise modified.

98. **Numerosity/Impracticability of Joinder:** There are so many members of the Classes that joinder of all members is impracticable. Tesla delivered over 30,000 Model S Vehicles in 2014,[19] over 50,000 Model S Vehicles in 2015,[20] and over 76,000 Model S Vehicles in 2016.[21] Additionally, Tesla

---

[19] *See* https://forums.tesla.com/forum/forums/how-many-cars-sold-2014-and-2015 (last visited Apr. 30, 2020).

[20] Yoni Heisler, *Tesla Sold More Than 50,000 Model S Sedans in 2015, a New Annual Record*, BGR (Jan. 3, 2016), accessible at https://bgr.com/2016/01/03/tesla-model-s-sales-2015/ (last visited Apr. 30, 2020).

[21] Andrew J. Hawkins, *Tesla Delivered Over 76,000 Vehicles in 2016, Falling Slightly Short of Goal*, The Verge (Jan. 20, 2017), accessible at https://www.theverge.com/2017/1/3/14159292/tesla-q4-2016-delivery-production-model-s-x (last visited Apr. 30, 2020).

delivered over 18,000 Model X Vehicles in 2015 and 2016.[22]  Accordingly, Plaintiff estimates that there are thousands of members in the Class who are readily identifiable from information and records in Defendant's possession, custody, or control.  The disposition of these claims will provide substantial benefits to the members of the Classes.

99.     **Commonality and Predominance:** There is a well-defined community of interest and common questions of law and fact that predominate over any question affecting only individual members of the Classes.  These common legal and factual questions, which do not vary from members of the Classes, and which may be determined without reference to the individual circumstances of any members of the Classes, include, but are not limited, to the following:

a)     whether the Vehicles suffer from one or more Defect;

b)     whether the Defect causes the MCU to malfunction, disabling many of the Vehicles' essential features, including safety features;

c)     whether the Vehicles have suffered a diminution of value as a result of their defective components;

d)     whether Defendant's marketing and promotion of the Vehicles was false and misleading;

e)     whether Defendant concealed facts from Plaintiffs and members of the Classes about the performance and safety of the Vehicles and about the Defect;

f)     whether Defendant knew, or should have known, that its representations were false, or that the representations omitted material information;

g)     whether Defendant had a duty to disclose the Defect to Plaintiffs and members of the Classes;

h)     whether Defendant's conduct was a violation of the CLRA;

i)     whether Defendant's conduct was a violation of the UCL;

---

[22] *Tesla Model X U.S. Sales Figures*, CarSalesBase, accessible at https://carsalesbase.com/us-tesla-model-x/ (last visited Apr. 30, 2020).

j)      whether Defendant's conduct was a breach of express warranty under California law;

k)      whether Defendant's conduct was a breach of implied warranty of merchantability under California law;

l)      whether Defendant's conduct was a violation of the FDTPA;

m)      whether Defendant's conduct was a breach of express warranty under Florida law;

n)      whether Defendant's conduct was a breach of implied warranty of merchantability under Florida law;

o)      whether Defendant's conduct was a violation of the Pennsylvania UTPCPL;

p)      whether Defendant's conduct was a breach of express warranty under Pennsylvania law;

q)      whether Defendant's conduct was a breach of implied warranty of merchantability under Pennsylvania law;

r)      whether Defendant's conduct was a breach of express warranty under Texas law;

s)      whether Defendant's conduct was a breach of implied warranty of merchantability under Texas law;

t)      whether Defendant's conduct as alleged herein violates public policy; and

u)      whether Plaintiffs and the members of the Classes are entitled to damages, restitution, equitable relief, and/or other damages and other relief, and, if so, the amount and nature of such relief.

100.   **Typicality and Adequacy:**  Plaintiff's claims are typical of the claims of the proposed Classes, and Plaintiffs will fairly and adequately represent and protect the interests of the proposed Classes.  Plaintiffs do not have any interests antagonistic to those of their respective Classes.  Plaintiffs' counsel are experienced in the prosecution of this type of litigation.  The questions of law and fact common to the members of the Classes, some of which are set forth above, predominate over any questions affecting only individual members of the Classes.

101.   **Superiority:**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  The expense and burden

of individual litigation would make it impracticable or impossible for members of the Classes to prosecute their claims individually.  The litigation and trial of the Class-wide claims are manageable.

102.   Unless the Classes are certified, Defendant will improperly retain monies that it received from Plaintiffs and members of the Classes as a result of its conduct.  Unless Defendant is required to change its unfair and deceptive practices, it will continue to commit the violations, and the members of the Classes and the general public will continue to be misled.

103.   Defendant has acted and refused to act on grounds generally applicable to the Classes, making appropriate final injunctive relief with respect to the Classes as a whole.

**COUNT I**
**Violation of Consumers Legal Remedies Act**
**California Civil Code §§ 1750, *et seq.***
**(On Behalf of the Nationwide Class and, In the Alternative, the California Sub-Class)**

104.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

105.   This cause of action is brought under the CLRA.  Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class are consumers as defined by California Civil Code § 1761(d), and the Vehicles constitute goods within the meaning of the CLRA.

106.   Defendant has violated, and continues to violate, the CLRA by engaging in the following deceptive practices proscribed by California Civil Code § 1770(a) in connection with transactions intended to result in, and that did result in, the sale and/or lease of the Vehicles to Faragalla, members of the Nationwide Class, and members of the California Sub-Class in violation of, *inter alia*, the following provisions:

a)      Representing that the goods have characteristics, uses, or

benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

b)      Representing that the goods are of a particular standard, quality, or grade if they are of another (Cal. Civ. Code § 1770(a)(7));

c)      Representing that a transaction involves rights, remedies, or obligations that it does not have or involve (Cal. Civ. Code § 1770(a)(14)); and

d)      Representing that the goods have been supplied in accordance with a previous representation when they have not (Cal. Civ. Code § 1770(a)(16)).

107.   Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class, in purchasing and using the Vehicles, did reasonably act in response to Defendant's above representations or would have considered the omitted facts set forth herein as material to their purchasing/leasing decision. Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class have suffered damages by the wrongful acts and practices of Defendant that are in violation of California Civil Code § 1781.

108.   The representations and omissions regarding the Vehicles were material to Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class.  Defendant intended that Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class would rely on these representations and omissions, and they did, in fact, rely on these representations and omissions.

109.   In accordance with California Civil Code § 1780(a), Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class seek injunctive relief for Defendant's violations of the CLRA.

110.   In accordance with California Civil Code §§ 1782(a) and (d), Plaintiff Faragalla has provided Defendant with the appropriate notice and demand, but

Defendant has denied the existence of a defect and has refused to provide any class-wide relief to members of the Nationwide Class and members of the California Sub-Class.

111.    Plaintiffs seeks for themselves, members of the Nationwide Class, and members of the California Sub-Class, compensatory and punitive damages under the CLRA, and also to recover attorneys' fees and costs pursuant to California Civil Code §§ 1780 and 1781.

**COUNT II**
**Unlawful, Unfair, and Fraudulent Business Practices in Violation of California Business and Professions Code §§ 17200, *et seq*.**
**(On Behalf of the Nationwide Class and, In the Alternative, the California Sub-Class)**

112.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

113.    The UCL defines unfair competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.

114.    Defendant has violated, and continues to violate, the UCL by misrepresenting the Vehicles as having superior performance and safety features and by omitting the fact that the Vehicles contain a Defect, whereby the MCU goes blank and malfunctions, disabling various essential features of the Vehicles, including safety features, and by failing to inform purchasers and lessees how to respond when the Defect manifests.

115.    By engaging in the above-described acts and practices, Defendant has committed an unfair business practice within the meaning of the UCL. Consumers/Class members have suffered substantial injury they could not reasonably have avoided other than by not purchasing the Vehicles.

116.    Defendant's acts and practices have deceived and/or are likely to deceive Nationwide Class members, California Sub-Class members and the public and, thus, constitute a fraudulent business practice.  Defendant uniformly marketed

the Vehicles as delivering superior performance and safety features, when, in fact, they do not, because the Vehicles contain a Defect that causes the MCU to malfunction, disabling various essential features of the Vehicles, including safety features, which Defendant knew, or should have known.

117.   As discussed above, Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class purchased and/or leased the Vehicles directly from Defendant.  Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class were injured in fact and lost money as a result of such acts of unfair competition.

118.   The injuries suffered by Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class are greatly outweighed by any potential countervailing benefit to consumers or to competition.  The injuries suffered by Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class should have or could have been reasonably avoided.

119.   Defendant received the funds paid by Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class and profited by misrepresenting the properties of the Vehicles that it otherwise would not have sold.  Defendant's revenues attributable thereto are, thus, directly traceable to the substantial amount of money paid out by Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class.

120.   Unless Defendant is enjoined from continuing to engage in the unlawful, unfair, and fraudulent business acts and practices as described herein, which conduct is ongoing, Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class will continue to be injured by Defendant's conduct.

121.   Defendant, through its acts of unfair competition, has acquired money from the Nationwide Class members and California Sub-Class members.

Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class request this Court to enjoin Defendant from continuing to violate the UCL.

122.   The unlawful, unfair, and fraudulent conduct described herein is ongoing and continues to this date.  Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

### COUNT III
### Breach of Express Warranty Under California Law
### (On Behalf of the Nationwide Class and, In the Alternative, the California Sub-Class)

123.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

124.   As an express warrantor, manufacturer, and merchant, Defendant had certain obligations pursuant to its Warranty to repair and replace defects. Cal. Com. Code § 2313.

125.   Defendant expressly warranted the touchscreen MCU under its New Vehicle Limited Warranty and Parts, Body & Paint Repair Warranty, promising to repair or replace components that fail to function properly during normal use, for 4 years or 50,000 miles.

126.   However, Defendant sells the Vehicles knowing that the Defect causes serious safety issues and causes numerous essential features to fail when the Vehicles' MCUs malfunction, so that Plaintiffs, the Nationwide Class members, and the California Sub-Class members are deprived of warranted features of the Vehicles.

127.   The Defect at issue in this litigation was present at the time of sale and/or lease to Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class.

128.   Defendant breached (and continues to breach) its warranties because it wrongfully, uniformly, and repeatedly refuses to repair the Defect, forcing

Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class to either (a) drive their Vehicles at the risk of the MCUs malfunctioning, shutting down numerous essential features of the Vehicles, including safety features, putting Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class at great risk of an accident, or (b) not drive their Vehicles at all in order to avoid such a risk.

129.   Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use, and have performed each and every duty required under the terms of the Warranty, including presentment, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

130.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

131.   In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for Warranty repairs and coverage relating to the Defect from other members of the Classes, defined herein.

132.   In its capacity as a supplier and warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit its express warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

133.   Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Defendant has wrongfully, uniformly, and repeatedly refused and/or failed to properly repair or replace the MCU.

134.   As such, Defendant should be estopped from disclaiming liability for its actions.

135.   Accordingly, Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class have suffered damages caused by Defendant's breach of the Warranty and are entitled to recover damages as set forth herein.

## COUNT IV
**Breach of the Implied Warranty of Merchantability Under California Law (On Behalf of the Nationwide Class and, In the Alternative, the California Sub-Class)**

136.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

137.   By operation of law, Tesla, as a manufacturer of the Vehicles and as offeror of its Warranty, impliedly warranted to Plaintiffs and Class members that the Vehicles they purchased were of merchantable quality and fit for their ordinary and intended use due to the defective MCU, as described herein.

138.   Consumers purchased and/or leased their Vehicles directly from Tesla, and are, therefore, the intended beneficiaries of Tesla's Warranty.  Plaintiffs and Class members were intended to be the ultimate users of the Vehicles, and Tesla's express Warranty was designed for and intended to benefit end-user purchasers.

139.   Tesla breached the implied warranty of merchantability in connection with its sale and/or lease and distribution of the Vehicles. At the point of sale and/or lease, the Vehicles contained a latent Defect which rendered the Vehicles defective and unfit for their ordinary and intended purposes.

First Amended Class Action Complaint
41

140.   Had Plaintiffs and Class members known that the Vehicles were defective, they would not have purchased them or would not have purchased them at the price they paid.

141.   Plaintiffs and Class members furnished Tesla an opportunity to cure its breach of warranty and complied with all obligations under the implied warranty of merchantability.  Despite knowing the Vehicles were defective prior to or concurrent with its sale and/or lease, Tesla has refused to provide Plaintiffs and Class members with appropriate and effective warranty relief.  As a result, Plaintiffs and Class members are left without the functional Vehicles they reasonably expected when making their purchasing and/or leasing decisions.

142.   As a direct and proximate result of Tesla's breach of the implied warranty of merchantability, Plaintiffs and Class members have sustained damages in an amount to be determined at trial.

## COUNT V
**Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*(In the Alternative, On Behalf of the Florida Sub-Class)**

143.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

144.   Plaintiff Urban brings this claim on behalf of himself and the Florida Sub-Class.

145.   FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).  Defendant engaged in unfair and deceptive practices that violated the FDUTPA, as described above.

146.   Defendant engaged in "trade or commerce" in Florida within the meaning of the FDUTPA.  *See* Fla. Stat. § 501.203(8).

147.   In the course of its business, Defendant failed to disclose and actively concealed the Defect contained in the Vehicles and the corresponding dangers and risks posed by the Vehicles, as described above, and otherwise engaged in activities with a tendency or capacity to deceive.

148.   In violation of the FDUTPA, Defendant employed unfair and deceptive acts or practices, fraud, false pretense, misrepresentation, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and/or lease of Vehicles.  Defendant knowingly concealed, suppressed, and omitted material facts regarding the Defect and associated safety hazard and misrepresented the standard, quality, or grade of the Vehicles, which directly caused harm to Urban and the Florida Sub-Class.

149.   Defendant actively suppressed the fact that the Vehicles contain a Defect and presents a safety hazard because of materials, workmanship, and/or manufacturing defects.  Further, Defendant employed unfair and deceptive trade practices by denying repairs or replacement of the Defect within a reasonable time in violation of the FDUTPA.  Defendant also breached their warranties as alleged above, in violation of the FDUTPA.

150.   As alleged above, Defendant has known of the Defect contained in the Vehicles for years.  Prior to selling and leasing the Vehicles, Defendant knew or should have known the Vehicles contained the Defect due to pre-production testing.  Defendant also should have known of the Defect from the early complaints and service requests it received from Class members, from repairs and/or replacements of the MCU, and from other internal sources.  Defendant, nevertheless, failed to disclose and actively concealed the dangers and risks posed by the Vehicles and the Defect.

151.   By failing to disclose and by actively concealing the Defect in the Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting themselves as a reputable manufacturer or distributor for a reputable manufacture that values safety, Defendant engaged in unfair or deceptive business practices in violation of the FDUTPA.  Defendant deliberately withheld the information about the propensity of the Defect to cause the MCU to go blank, freeze and/or crash, disabling several features of the Vehicles.  Further, Defendant knew, or should have known, that such malfunction could cause the Vehicles to become involved in collisions or other accidents, putting vehicle operators, passengers and other motorists at risk for injury.  Defendant deliberately concealed and failed to disclose this material information to ensure that consumers would purchase the Vehicles and spend money on useless remedies and repairs.

152.   Defendant's unfair and deceptive trade practices were likely intended to deceive a reasonable consumer.  Urban and members of the Florida Sub-Class had no reasonable way to know that the Vehicles contained the Defect, which were defective in materials, workmanship and/or manufacture, and posed a serious and significant safety risk.  Defendant possessed superior knowledge as to the quality and characteristics of the Vehicles, including the Defect within their Vehicles and its associated safety risks, and any reasonable consumer would have relied on Defendants' misrepresentations and omissions, as Urban and members of the Florida Sub-Class did.

153.   Defendant intentionally and knowingly misrepresented material facts and omitted material facts regarding the Vehicles and the Defect present in Vehicles with an intent to mislead Urban and the Florida Sub-Class.

154.   Defendant knew or should have known that its conduct violated the FDUTPA.

155.   Defendant made material statements and/or omissions about the safety and reliability of the Vehicles and/or the Defect installed in them that were either false or misleading.  Defendant's misrepresentations, omissions, statements, and commentary have included selling and marketing Vehicles as safe and reliable, despite its knowledge of the Defect and its corresponding safety hazards.

156.   To protect its profits, avoid remediation costs and public relation problems, and increase its profits by having consumers pay for component parts and expensive repairs to remedy the Defect, Defendant concealed the defective nature and safety risk posed by the Vehicles and existing Defect at the time of sale or lease.  Defendant allowed unsuspecting new and used car purchasers and lessees to continue to buy or lease the Vehicles and continue to drive them, despite the safety risk they pose.

157.   Defendant owed Urban and the Florida Sub-Class a duty to disclose the true safety and reliability of the Vehicles and the existence of the Defect because Defendant:  possessed exclusive knowledge of the Defect and its associated safety hazard; intentionally concealed the foregoing from Urban and the Florida Sub-Class; and/or made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Urban and the Florida Sub-Class that contradicted these representations, *inter alia*, that a Defect existing at the time of sale or lease causes the MCU to go blank, and freeze and/or crash, disabling several features of the Vehicles.

158.   Because Defendant fraudulently concealed the Defect in the Vehicles, and now that the Defect has been disclosed, the value of the Vehicles has greatly diminished, and they are now worth significantly less than they otherwise would be.  Further, Urban and the Florida Sub-Class were deprived of the benefit of the bargain they reached at the time of purchase or lease.

159.   Defendant's failure to disclose and active concealment of the Defect in the Vehicles were material to Urban and the Florida Sub-Class.  A vehicle made by an honest and reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a dishonest and disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly reports on and remedies them.

160.   Urban and the Florida Sub-Class suffered ascertainable losses caused by Defendant's misrepresentations and its failure to disclose material information. Had Urban and the Florida Sub-Class members been aware of the Defect that existed in the Vehicles and Tesla's complete disregard for the safety of its consumers, Urban and the Florida Sub-Class either would not have paid as much for their Vehicles or would not have purchased or leased them at all.  Urban and the Florida Sub-Class did not receive the benefit of their bargain as a result of Defendant's misconduct.

161.   Urban and the Florida Sub-Class risk loss of use of their vehicles as a result of Defendant's acts and omissions in violation of the FDUTPA, and these violations present a continuing risk to Urban, the Florida Sub-Class, and the public in general.  Defendant's unlawful acts and practices complained of above affect the public interest.

162.   As a direct and proximate result of Defendant's violations of the FDUTPA, Urban and the Florida Sub-Class have suffered injury-in-fact and/or actual damage.

163.   Urban and the Florida Sub-Class are entitled to recover their actual damages, under Fla. Stat. § 501.211(2), and attorney's fees under Fla. Stat § 501.2105(1).

164.   Urban and the Florida Sub-Class also seek an order enjoining Defendant's unfair, unlawful, and deceptive practices, declaratory relief, attorney's fees, and any other just and proper relief available under the FDUTPA.

## COUNT VI
### Breach of Express Warranty Under Florida Law
### (In the Alternative, On Behalf of the Florida Sub-Class)

165.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

166.   Urban brings this claim on behalf of himself and the Florida Sub-Class.

167.   Tesla provided all purchasers and lessees of the Vehicles with an express warranty described *infra*, which became a material part of the bargain. Accordingly, Tesla's express warranty is an express warranty under Florida law. *See* Fla. Stat. §§ §§ 672.313 and 680.210.

168.   Under the Warranty, Tesla warrants that it will cover the repair or replacement necessary to correct defects in the materials or workmanship of any parts manufactured or supplied by Tesla that occur under normal use for a period of 4 years or 50,000 miles, whichever comes first.

169.   Tesla breached the express warranties by selling and leasing Vehicles requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the defective components which cause the Defect.  In addition, when Tesla did perform repairs, it nevertheless breached the express warranty by failing to completely repair the Defect, such that the MCUs in the Vehicles are still subject to going blank, freezing and/or crashing, disabling several features of the Vehicles.

170.   Urban and members of the Florida Sub-Class have had sufficient direct dealings with Tesla to establish privity of contract between Tesla, on one

hand, and Urban and each of the other Class members on the other hand.  Urban and each of the other Florida Sub-Class members are intended to be the ultimate consumers of the Vehicles and the warranty agreements were designed for and intended to benefit the consumer.

171.   Urban and members of the Florida Sub-Class were not required to notify Tesla of the breach because affording Tesla a reasonable opportunity to cure its breach of written warranty would have been futile.  Tesla was also on notice of the Defect from its own testing, from early complaints and service requests it received from Class members, from repairs and/or replacements of MCU, and from other internal sources.

172.   Urban also provided notice of express warranties when he took his Vehicle to a Tesla service center in Orlando, Florida.  Despite this notice, Tesla failed to cure the breach of express warranties within an adequate time.

173.   As a direct and proximate cause of Tesla's breach of express warranties, Urban and the members of the Florida Sub-Class have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease.  Additionally, Urban and the Florida Sub-Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

174.   Urban and the members of the Florida Sub-Class seek full compensatory damages allowable by law, attorney's fees, costs, punitive damages, restitution, the repair or replacement of all Vehicles, the refund of money paid to own or lease, and appropriate equitable relief including injunctive relief, a declaratory judgment, and a court order enjoining Tesla's wrongful acts and practices, and any other relief to which Urban and the Florida Sub-Class members may be entitled.

## COUNT VII
### Breach of Implied Warranty of Merchantability Under Florida Law
### (In the Alternative, On Behalf of the Florida Sub-Class)

175.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

176.   Urban brings this claim on behalf of himself and the members of the Florida Sub-Class.

177.   Tesla was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Vehicles.

178.   Tesla provided Urban and Florida Sub-Class members with an implied warranty that the Vehicles and their components and parts are merchantable, pass without objection in the trade, are fit for the ordinary purposes for which they were sold, are adequately labeled, and conform to the promises and affirmations on the label.  However, the Vehicles are not merchantable because they are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Vehicles suffer from an inherent Defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.  The Vehicles would not pass without objection in the trade because the Defect causes the MCUs to go blank, freeze and/or crash, disabling several features of the Vehicles.

179.   Tesla impliedly warranted that the Vehicles were of merchantable quality and fit for their intended use.  This implied warranty included, among other things: (i) a warranty that the Vehicles and their MCUs, which were manufactured, supplied, distributed, and/or sold by Tesla, would provide safe and reliable transportation; (ii) a warranty that the Vehicles and their MCUs would be fit for their intended use; (iii) a warranty that the Vehicles and their MCUs would pass without objection in the trade; (iv) a warranty that they Vehicles are adequately

labeled; and (v) a warranty that the Vehicles would conform the promises and affirmations on their labels.

180.    Contrary to the applicable implied warranties, the Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Urban and Florida Sub-Class members with reliable, durable, and safe transportation, would not pass without objection in the trade, were not adequately labeled, and did not conform to the promises and affirmation on their label. Instead, the Vehicles are defective, because the MCUs suffer from a Defect causing them to go blank, freeze and/or crash, disabling several features of the Vehicles.

181.    Urban and members of the Florida Sub-Class have had sufficient direct dealings with Tesla to establish privity of contract between Tesla, on one hand, and Urban and each of the other Class members on the other hand.  Urban and each of the other Florida Sub-Class members are intended to be the ultimate consumers of the Vehicles and the warranty agreements were designed for and intended to benefit the consumer.

182.    The alleged Defect is inherent and was present in each Vehicle at the time of sale.

183.    Because of Tesla's breach of the applicable implied warranties, owners and/or lessees of the Vehicles suffered an ascertainable loss of money, property, and/or value of their Vehicles.  Additionally, because of the Defect, Urban and Florida Sub-Class members were harmed and suffered actual damages in that they did not receive the benefit of their bargain and have suffered a diminution in value of their Vehicles.

184.    Tesla's actions, as complained of herein, breached the implied warranty that the Vehicles were of merchantable quality and fit for such use in violation of Fla. Stat. §§ 672.314 and 680.212.

185.   As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Urban and members of the Florida Sub-Class have been damaged in an amount to be proven at trial.

## COUNT VIII
**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law,**
**73 Pa. Stat. §§ 201-1 to 201-9.2**
**(In the Alternative, On Behalf of the Pennsylvania Sub-Class)**

186.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

187.   Patel brings this claim on behalf of himself and the members of the Pennsylvania Sub-Class.

188.   Patel, members of the Pennsylvania Sub-Class, and Defendant are each a "person" as defined at 73 Pa. Stat. § 201-2(2).

189.   Patel and Pennsylvania Sub-Class members purchased goods and services in "trade" and "commerce" as defined at 73 Pa. Stat. § 201-2(3).

190.   Patel and Pennsylvania Sub-Class members purchased goods and services primarily for personal, family, and/or household purposes under 73 Pa. Stat. § 201-9.2.

191.   Defendant engaged in "unfair methods of competition" or "unfair or deceptive acts or practices" as defined at 73 Pa. Stat. § 201-2(4) by engaging in the following conduct:

   a.  Representing that its goods and services had characteristics, uses, benefits, and qualities that they did not have (73 Pa. Stat. § 201-2(4)(v));

   b.  Representing that its goods and services were of a particular standard or quality when they were of another quality (73 Pa. Stat. § 201-2(4)(vii));

c.   Advertising its goods and services with intent not to sell them as advertised (73 Pa. Stat. § 201-2(4)(ix); and

d.   "Engaging in any other . . . deceptive conduct which creates a likelihood of confusion or of misunderstanding" (73 Pa. Stat. § 201-2(4)(xxi)).

192.   These unfair methods of competition and unfair or deceptive acts or practices are declared unlawful by 73 Pa. Stat. § 201-3.

193.   Defendant's unfair or deceptive acts and practices include, but are not limited to:  manufacturing, advertising, and selling and/or leasing Vehicles with an inherent Defect, causing the MCU to go blank, freeze and/or crash, disabling several features of the Vehicles; and failing to disclose this Defect to consumer at the time of sale or lease or at any time thereafter.

194.   Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about, *inter alia*, the quality and characteristics of the Vehicles.

195.   Defendant intended to mislead consumers and induce them to rely on its misrepresentations and omissions.  As set forth herein, Patel and members of the Pennsylvania Sub-Class did rely on Defendant's misrepresentations and omissions relating to the Vehicles.

196.   Patel and Pennsylvania Sub-Class members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered with reasonable diligence.

197.   Had Defendant disclosed to consumers that its Vehicles contained the Defect, Patel and Pennsylvania Sub-Class members would not have purchased the Vehicles or would have paid less for them.

198.   Defendant acted intentionally, knowingly, and maliciously in violating the Pennsylvania UTPCPL, and recklessly disregarded consumers' rights.

199.   Tesla was on notice of the Defect from its own testing, from early complaints and service requests it received from Class members, from repairs and/or replacements of MCU, and from other internal sources.  Patel also provided notice of the Defect when he took his Vehicle to a Tesla service center in Devon, Pennsylvania.  Despite this notice, Tesla failed to cure the breach of express warranties within an adequate time.

200.   As a direct and proximate result of Defendant's unfair methods of competition and unfair or deceptive acts or practices, Patel and Pennsylvania Sub-Class members have suffered and will continue to suffer damages, injury, ascertainable losses of money or property, and monetary and non-monetary damages as described above.

201.   Patel and Pennsylvania Sub-Class members seek all monetary and non-monetary relief allowed by law, including the following as expressly permitted under 73 Pa. Stat. § 201-9.2:

    a.   "actual damages or [statutory damages of] one hundred dollars ($100), whichever is greater";

    b.   treble damages, defined as "three times the actual damages";

    c.   "reasonable attorney fees" and litigation costs; and

    d.   "such additional relief as [the Court] deems necessary or proper."

202.   Patel and Pennsylvania Sub-Class members also seek the injunctive relief as set forth above.

## COUNT IX
### Breach of Express Warranty Under Pennsylvania Law
### (In the Alternative, On Behalf of the Pennsylvania Sub-Class)

203.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

204.   Patel brings this claim on behalf of himself and the members of the Pennsylvania Sub-Class.

205.   As an express warrantor, manufacturer, and merchant, Defendant has certain obligations under 13 Pa. C.S. § 2313 to ensure the Vehicles (and the MCUs therein) conform to their Warranty.

206.   When Patel and Pennsylvania Sub-Class members purchased or leased the Vehicles, Defendant warranted that it would repair or replace components of the Vehicle, including the MCU, free of charge if they were defective in material or workmanship.

207.   Patel and Pennsylvania Sub-Class members were aware of the Warranty at the time of sale or lease, because, *inter alia*, the terms of the Warranty are available on Defendant's website, along with all of the literature and written materials related to Tesla's Vehicles, including Owners Manuals.

208.   Indeed, the Warranty formed a basis of the bargain that was reached when Patel and Pennsylvania Sub-Class members purchased or leased their Vehicles.

209.   Defendant breached the Warranty – and continues to breach it – because it has failed to deliver non-defective Vehicles to Patel and Pennsylvania Sub-Class members despite, in many cases, attempts at repair.  Indeed, Defendant failed to provide Patel and the Pennsylvania Sub-Class members with a conforming, non-defective Vehicle despite repair attempts.

210.   The Vehicles sold or leased to Patel and Pennsylvania Sub-Class Members are defective, as alleged in detail in this Complaint, and the Defect was present at the time of each transaction.  Moreover, Defendant has failed to correct, repair, or eliminate the Defect.

211.   Patel has used his Vehicle in a manner consistent with its intended use; he did not misuse it, alter it, tamper with it, or subject it to excessive or unnecessary wear.  Patel has taken no action, and no conditions or events have occurred, that would void the Warranty.  Moreover, Patel has performed each and

every duty required under the terms of the Warranty, except as may have been excused or prevented by the conduct of Defendant or by operation of law.

212. Defendant has received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy. Affording Defendant further opportunity to cure its breach of warranty would be unnecessary and futile.

213. Additionally, upon information and belief, Defendant otherwise has knowledge of the defect at issue in this litigation, as explained *supra*.

214. In its capacity as a supplier and/or warrantor, and by the deceptive, unfair, and unconscionable conduct described herein, any attempt by Defendant to limit the Warranty in a manner that would exclude or limit coverage for the defects present in the MCUs as of the time of sale, which Defendant knew about prior to offering the Vehicles for sale, which Defendant concealed and did not disclose, and did not remedy prior to sale or afterward, is unconscionable, and any such effort to disclaim or otherwise limit liability for the defects at issue is null and void.

215. Any attempt by Defendant to limit or exclude any form of damages or other remedies, including, without limitation, consequential and incidental damages, is unconscionable and therefore null and void due to Defendant's deceptive, unfair, and unconscionable conduct.

216. Patel and the Pennsylvania Sub-Class members have been injured by Defendant's breach of warranty and seek to recover damages including, without limitation, restitution, consequential and incidental damages, attorney's fees and costs, and any other relief this Court deems just and appropriate.

## COUNT X

**Breach of Implied Warranty of Merchantability Under Pennsylvania Law,
Pa. C.S. § 2314
(In the Alternative, On Behalf of the Pennsylvania Sub-Class)**

217.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

218.   Patel brings this claim on behalf of himself and the members of the Pennsylvania Sub-Class.

219.   A warranty that the Vehicles are in merchantable quality and condition is implied under 13 Pa. C.S. § 2314.

220.   Defendant is, and was at all relevant times, a merchant with respect to the Vehicles.

221.   Defendant did not disclaim the implied warranty of merchantability.

222.   Defendant impliedly warranted that the Vehicles were of good and merchantable condition and quality – fit for their ordinary intended use, namely, driving without the MCUs going blank, freezing and/or crashing, disabling several features of the Vehicles.

223.   The MCUs were defective at the time they left the possession of Defendant in the ways described in detail *supra*. Defendant knew of the defects at the time these transactions occurred, as set forth in this Complaint. Thus, the Vehicles, when sold and at all times thereafter, were not in merchantable condition or quality and were not fit for their ordinary intended purposes.

224.   Patel used his Vehicle in a manner consistent with its intended use; he did not misuse it, alter it, tamper with it, or subject it to excessive or unnecessary wear.  Patel took no action, and no conditions or events occurred, that would void the Warranty.  Moreover, Patel has performed each and every duty required under the terms of the Warranty, except as may have been excused or prevented by the conduct of Defendant or by operation of law.

225.   Defendant has received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy. Additionally, upon information and belief, Defendant otherwise has knowledge of the defect at issue in this litigation, as alleged in this Complaint.

226.   By virtue of the conduct described herein and throughout this Complaint – namely, its failure to deliver merchantable Vehicles to Patel and Pennsylvania Sub-Class members, Defendant breached the implied warranty of merchantability.

227.   Any attempt by Defendant to limit or exclude any form of damages or other remedies, including, without limitation, consequential and incidental damages, is unconscionable and therefore null and void due to Defendant's deceptive, unfair, and unconscionable conduct.

228.   As a direct and proximate cause of Defendant's breach of the implied warranty of merchantability, Patel and the Pennsylvania Sub-Class members have been damaged by receiving an inferior product from that which they were impliedly promised.  Patel and the Pennsylvania Sub-Class, therefore, seek to recover damages including, without limitation, restitution, consequential and incidental damages, attorney's fees and costs, and any other relief the Court deems just and appropriate.

**COUNT XI**
**Breach of Express Warranty Under Texas Law**
**(In the Alternative, On Behalf of the Texas Sub-Class)**

229.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

230.   Plaintiff Cravens brings this claim on behalf of himself and the Texas Sub-Class.

231.   As an express warrantor, manufacturer, and merchant, Tesla had certain obligations pursuant to its Warranty to repair and replace defects.  Tex. Bus. & Com. Code § 2.313.

232.   Tesla expressly warranted the MCU, under the New Vehicle Limited Warranty, which includes a Basic Vehicle Limited Warranty and the Parts, Body & Paint Repair Limited Warranty, which specifically covers the touchscreen and microcontroller, promising to repair or replace components that fail to function properly during normal use for a period of 4 years or 50,000 miles, whichever comes first.

233.   However, Defendant sells and/or leases the Vehicles knowing that the Defect causes serious safety issues when the MCU goes blank, freezing and/or crashing, disabling several features of the Vehicles, including safety features, so that Cravens and the Texas Sub-Class members are deprived of a warranted feature of the Vehicles.

234.   The Defect at issue in this litigation was present at the time of sale and/or lease to Cravens and members of the Texas Sub-Class.

235.   Tesla breached its warranties (and continues to breach its warranties) because it wrongfully, uniformly, and repeatedly refuses to repair the Defect, forcing Cravens and members of the Texas Sub-Class to either (a) drive their Vehicles at the risk of the MCU going blank, freezing and/or crashing, disabling several features of the Vehicles, including safety features, putting them at great risk of an accident, or (b) not drive their Vehicles at all in order to avoid such a risk.

236.   Cravens and members of the Texas Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use and have performed each and every duty required under the terms of the Warranty, including presentment, except as may have been excused or prevented by the conduct of

Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

237.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

238.   In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for Warranty repairs and coverage from other members of the Classes.

239.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Tesla to disclaim or otherwise limit its express warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

240.   Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Tesla has wrongfully, uniformly, and repeatedly refused and failed to properly repair or replace the MCU.

241.   As such, Defendant should be estopped from disclaiming liability for its actions.

242.   Accordingly, Cravens and members of the Texas Sub-Class have suffered financial injury and damages proximately caused by Tesla's breach of its Warranty and are entitled to recover damages as set forth herein.

243.   The deceptive conduct described herein is ongoing and continues to this date.  Cravens and members of the Texas Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

**COUNT XII**
**Breach of Implied Warranty of Merchantability Under Texas Law**
**(In the Alternative, On Behalf of the Texas Sub-Class)**

244. Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

245. Plaintiff Cravens brings this claim on behalf of himself and the Texas Sub-Class.

246. As discussed herein, Defendant has manufactured and sold the Vehicles to Cravens and the Texas Sub-Class.

247. Defendant impliedly warranted that the Vehicles were of good and merchantable condition and quality – fit for their ordinary intended use, namely, driving without the MCUs going blank, freezing and/or crashing, disabling several features of the Vehicles.

248. The Defect at issue in this litigation was present at the time of sale and/or lease to Cravens and members of the Texas Sub-Class, and the Defect rendered the Vehicles unfit for the ordinary purposes for which they are used because of lack of something necessary for adequacy; namely, because the Vehicles do not operate without the MCU spontaneously going blank, freezing and/or crashing, disabling several features of the Vehicles, including safety features.

249. Cravens and members of the Texas Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use.

250. Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

251. In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and

requests for Warranty repairs and coverage from other members of the Texas Sub-Class.

252.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Tesla's to disclaim or otherwise limit its warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendants should be estopped from pursuing such defenses.

253.   Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Tesla has wrongfully, uniformly, and repeatedly refused and failed to properly repair or replace the MCU.

254.   As such, Defendant should be estopped from disclaiming liability for its actions.

255.   Accordingly, Cravens and members of the Texas Sub-Class have suffered injury caused by Defendant's breach of the implied warranty of merchantability and are entitled to recover damages as set forth herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the proposed Classes, pray for judgment as follows:

a)    Certification of the Nationwide Class or, in the alternative, California, Florida, and Pennsylvania Sub-Classes under Federal Rule of Civil Procedure 23;

b)    Appointment of Plaintiffs as representatives of the Nationwide Class and their counsel as Class counsel;

c)    Appointment of Faragalla as representative of the California Sub-Class and his counsel as Class counsel;

d)    Appointment of Urban as representative of the Florida Sub-Class and his counsel as Class counsel;

e)      Appointment of Patel as representative of the Pennsylvania
        Sub-Class and his counsel as Class counsel;

f)      Appointment of Cravens as representative of the Texas Sub-
        Class and his counsel as Class counsel;

g)      Compensatory and other damages for economic and non-
        economic damages;

h)      Awarding restitution and disgorgement of Defendant's revenues
        or profits to Plaintiffs and the members of the proposed Classes;

i)      An Order requiring Defendant to cease and desist from
        engaging in the alleged wrongful conduct and to engage in a
        corrective advertising campaign;

j)      Statutory pre-judgment and post-judgment interest on any
        amounts;

k)      Payment of reasonable attorney's fees and recoverable litigation
        expenses as may be allowable under applicable law; and

l)      Such other relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated:      September 8, 2020                    Respectfully submitted,

                                    By: /s/ *Kolin Tang*
                                    Kolin Tang
                                    SHEPHERD, FINKELMAN, MILLER
                                    & SHAH, LLP
                                    1401 Dove Street, Suite 510
                                    Newport Beach, CA 92660
                                    Telephone: (323) 510-4060
                                    Facsimile: (866) 300-7367
                                    Email: ktang@sfmslaw.com

                                    James C. Shah
                                    SHEPHERD, FINKELMAN, MILLER
                                    & SHAH, LLP
                                    1845 Walnut Street, Suite 806
                                    Philadelphia, PA 19103

1

Telephone: (610) 891-9880
Facsimile: (866) 300-7367
Email: jshah@sfmslaw.com

2

3

John F. Edgar (to be admitted *pro hac vice*)
EDGAR LAW FIRM LLC
2600 Grand Blvd., Ste. 440
Kansas City, MO 64108
Telephone: (816) 531-0033
Facsimile: (816) 531-3322
Email: jfe@edgarlawfirm.com

4

5

6

7

8

Michael D. Donovan (to be admitted *pro hac vice*)
DONOVAN LITIGATION GROUP, LLC
1885 Swedesford Road
Malvern, PA 19355
Telephone: (610) 647-6067
Email:
mdonovan@donovanlitigationgroup.com

9

10

11

12

13

14

*Attorneys for Plaintiffs and the Proposed Classes*

15

16

17

18

19

20

21

22

23

24

25

26

27

28